IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

LISA HARTUNG,

                       Plaintiff,                    OPINION AND ORDER

  v.

                                                        12-cv-059-wmc

CAROLYN COLVIN, COMMISSIONER
FOR SOCIAL SECURITY,

                     Defendant.

---

Pursuant to 42 U.S.C. § 405(g), plaintiff Lisa Hartung seeks judicial review of the final decision of the defendant Commissioner of Social Security (Commissioner) denying her application for Disability Insurance Benefits and Supplemental Security Income under Titles II and XVI of the Social Security Act. First, Hartung contends that the administrative law judge (ALJ) presiding over her disability determination hearing posed hypothetical questions to the vocational expert without accounting for her moderate limitations in concentration, persistence, and pace. Second, Hartung contends that the ALJ failed to undertake the proper analysis with regard to her impairments based in part on drug and alcohol issues and improperly substituted his own judgment for the findings of a psychiatric expert. The court agrees with Hartung that the ALJ committed reversible error in both respects and will remand Hartung's petition to correct these issues.

FACTS[1]

## I. Plaintiff's Work History and Injury Claims

Plaintiff Lisa Hartung is a 36-year-old woman residing in Mindoro, Wisconsin. (AR 134, 148.) Hartung last worked as a dishwasher in 2006; she previously worked as a housekeeper and telemarketer. (AR 44.) Hartung quit her dishwashing job because of anxiety she believes may stem from her various conditions and has been unemployed ever since. (AR 44-5.)

Hartung filed applications for social security disability insurance benefits and supplemental security income on November 2, 2007, alleging that she has been disabled and unable to work full-time since March 1, 2006, because of non-epileptic partial seizures, complex partial seizures, depression, and anxiety. (AR 139-47.)

Non-epileptic partial seizures are characterized by a localized onset of epilepsy-like symptoms, but without the abnormal brain wave patterns that typically accompany epilepsy. *Stedman's Medical Dictionary*, 1744 (28th ed. 2006). Complex partial seizures are similar to partial seizures, but are accompanied by a loss or impairment of consciousness. *Id.* Hartung has experienced both. Hartung and her mother both claim that Hartung has also experienced "grand mal" seizures, which are now referred to as "generalized tonic-clonic" seizures. (AR 57, 61, 188, 325.) These are characterized by a sudden contraction of the muscles, giving way to convulsions and followed by a variable period of unconsciousness and gradual recovery. *Id.*

---

[1] The following facts are taken from the Administrative Record ("AR"), which can be found at dkt. #7.

Depression is a "mental state or chronic mental disorder characterized by feelings of sadness, loneliness, despair, low self-esteem, and self-reproach." *Id.* at 515. Anxiety is an "experience of fear or apprehension in response to anticipated internal or external danger" that can be accompanied by muscle tension, restlessness, or cognitive symptoms such as confusion and decreased concentration. *Id.* at 114.

## II. Medical Records

The oldest relevant medical records available for review are from 2006, when Hartung met with neurologist Dr. Gregory Pupillo at Franciscan Skemp Healthcare in La Crosse, Wisconsin, about a history of seizure disorder. (AR 237.) Dr. Pupillo found that Hartung's seizure disorder had been well-controlled since 2005 by the Keppra and Tegretol. (AR 237.) Pupillo also noted Hartung's history of anxiety and depression, although he did not report that Hartung was taking any medication for those conditions at the time. (AR 237.) Dr. Pupillo advised Hartung to cease her daily use of cannabis, as he was concerned that the marijuana, although not seizure-triggering on its own, could contain street drugs that trigger seizures. (AR 237.)

Hartung followed up with Dr. Pupillo six months later, at which time he noted that Hartung was taking Effexor and Nexium in addition to Keppra and a tapering dosage of Tegretol. (AR 238.) Dr. Pupillo expressed optimism that Hartung would be able to completely discontinue use of Tegretol by slowly decreasing her dosage until it was totally tapered. (AR 238.) Her seizures appeared to be completely under control with the use of Keppra. (AR 238.)

By late 2006, Hartung was seizure free and relying only on Keppra to contain her disorder. (AR 239.) She was still taking medication for mental health, but had lived without seizures since 2005 and Dr. Pupillo felt she was functioning well. (AR 239, 241.) In 2007, Hartung became sick while driving, vomited, and had a possible tonic-clonic seizure that brought her to an emergency room. (AR 242, 248, 276.) After being informed of the incident, Dr. Pupillo initially believed the seizure was caused by Hartung vomiting, leading to a decrease in medication levels in her system. However, Hartung began to report additional seizures after the incident. (AR 242.) In October of 2007, Dr. Pupillo expressed uncertainty as to the cause of these seizures and was beginning to doubt that they were epileptic; still, he increased Hartung's dose of Keppra in an attempt to offset symptoms. (AR 243, 255.) An electroencephalography (EEG) at that time indicated her condition to be a minimal and generalized, nonepileptic disturbance of cerebral activity. (AR 247.)

From October of 2007 into 2008, Hartung continued to report experiencing both partial seizures and generalized tonic-clonic seizures. (AR 271, 277.) She apparently experienced a seizure after finishing an MRI test, although her neurologist denies having witnessed this. (AR 277, 445.) Dr. Pupillo has expressed the belief that many episodes of confusion and hot flashes were not in fact seizures, but actually anxiety attacks. (AR 357.)

Hartung's psychiatrist, Dr. Gilda Winter, has diagnosed Hartung with personality disorder, a mild cognitive disorder, and a mood disorder, along with "excessive and nearly incapacitating" anxiety at times. (AR 357.) Hartung has been medicated for both

4

anxiety and depression with a variety drugs.  (AR 277-79, 349, 355, 357.)  However, Dr. Winter's treatment notes indicate that Hartung's symptoms seem to be at least partially caused by behavioral issues that needed to be addressed, such as Hartung's lack of activity, productive engagement and daily structure.  (AR 360.)  In an April 2010 Residual Functional Capacity evaluation, Dr. Winter could not explain the etiology of the mood and anxiety disorders, but opined that Hartung is not a malingerer and estimated that her cognitive and psychological impairments would require her to miss more than four days of work in a month.  (AR 440.)  Winter also opined that Hartungs' cannabis use contributed to her impairments.  (AR 440.)

In 2010, Dr. Winter referred Hartung to Dr. Linda Dunaway for further neuropsychological evaluation.  Dunaway completed a battery of cognitive tests, and explained that Hartung was dealing with some cognitive difficulties -- exacerbated by her continuing marijuana use -- but had the cognitive skills necessary to work.  (AR 345.) Dr. Dunaway noted that Hartung's "psychological problems and drug use pose the greater impediment to her functional status than her seizure-induced cognitive dysfunction." (AR 345.)

Throughout her relationship with treating psychiatrist, Dr. Winter repeatedly noted Hartung's dependence on cannabis. (AR 340-41.)  Hartung's use of the drug was self-reported, having told her physicians at various times that she smoked marijuana as often as every day and as seldom as 1-2 weekends a month.  (AR 340, 349.)  Hartung testified at the ALJ hearing that she smoked marijuana on a nightly basis to get to sleep.

(AR 56.)  In 2009, Dr. Winter expressed the belief that Hartung's substance abuse was worsening her existing cognitive impairments.  (AR 341.)

### III. Administrative Hearing

After considering various vocational factors, medical records and reports from consulting physicians, the state disability agency denied Hartung's application for benefits and her motion for reconsideration  (AR 74, 79.)  On August 6, 2008, she requested a hearing before an ALJ.  (AR 85.)

At that hearing, Hartung testified that she was experiencing about three small seizures per month and usually felt groggy the day of a seizure and the following day.  (AR 48.)  Hartung also reported experiencing one "big" seizure about every other week in 2007.  (AR 54.)  She told the ALJ that she helps out with the housework by washing dishes, doing some cleaning, and washing some laundry.  (AR 51-52.)  When asked by the ALJ why she would be unable to work at a dishwashing position again, Hartung "couldn't say for sure," but suspected that her "nerves" and being "groggy" might prevent her from working through a shift without taking breaks.  (AR 45-46.)

When asked if she uses marijuana every night before going to sleep, Hartung had the following exchange with the ALJ:

> Hartung: Usually, yes, but there have been some night[s] where I think there was like three weeks where I went without it, because the doctor had told me to stop and – I want to pull my hair out, I guess. You know, because I wasn't getting to that comfortable stage where my mind could just – Not necessarily go blank, but my mind could not concentrate on the things – On the problems. It was something that relaxed me.

> ALJ: But, the doctor doesn't want you to use it, right?
>
> Hartung: Yeah, the neurologist said, you know, to go ahead and it would probably be better if I wasn't using it.

There is no indication on the record that the ALJ's designated vocational expert, Mr. David Ostwald, reviewed any of Hartung's background materials, medical records, or vocational history before giving testimony. He apparently heard only the testimony given by Hartung and her mother before the ALJ and then answered a series of hypothetical questions concerning her limitations.

> Q: Mr. Ostwald, from what I can tell, the claimant's past relevant work was dishwasher and what else did she do?
>
> A: Some housekeeping.
>
> Q: Housekeeping.
>
> A: Housekeeper would be light, unskilled work. Dishwasher is medium or kitchen helper medium, unskilled work.
>
> Q: All right. Assume that I would find that an individual of the claimant's age, education, and work experience was limited to simple, unskilled work, not requiring work around dangerous moving machinery or heights and not requiring more than occasional public contact. No physical restrictions.
>
> A: She would return to her previous employment.
>
> Q: As a dishwasher?
>
> A: Yes.
>
> Q: And, as a housekeeper?
>
> A: As a housekeeper.
>
> Q: If, in fact, she were having the small petit mal seizures, as she called them, on an average of, at least, two to three times a month and that resulted in confusion and extreme fatigue for a day or so following those seizures and, as a consequence, she would probably miss two to three days of work a month,

then?

A: I wouldn't know of any work such a person could perform.

**IV. Administrative Law Judge Decision**

The ALJ issued a ruling on October 12, 2010, applying the required five-step process in denying Hartung social security benefits. The ALJ found that Hartung met the insured status requirements of the Social Security Act through March 31, 2011, and that she had not been engaged in substantial gainful activity since the beginning of the relevant period in 2006. (AR 28.)

The ALJ next found that Hartung suffered from four severe impairments: (1) history of seizure disorder; (2) an unspecified mood disorder; (3) an unspecified anxiety disorder; and (4) cannabis abuse. (AR 28.) He did not find that any of these impairments or combination of impairments met or medically equaled a listed impairment, having specifically considered listings 12.04, 12.06, and 12.09. (AR 28-29.) Specifically, the ALJ found that the "paragraph B" criteria were not satisfied because Hartung's impairments caused only "moderate" restrictions in daily living, social functioning, and concentration, persistence, or pace, and no "repeated" episodes of decompensation. (AR 29.) The ALJ also determined that the "paragraph C" criteria were not satisfied, because the record did not reflect a medically documented history of a chronic affective or anxiety disorder of at least 2 years' duration that has caused the necessary limitations. (AR 29.)

Next, the ALJ discussed his findings concerning Hartung's residual functional capacity ("RFC"). He determined that Hartung had the capacity for "all exertional levels

of work except for the limitation to unskilled work that does not involve heights or dangerous moving machinery." (AR 30.) The ALJ noted that he followed the two-step process of 20 CFR 404.1529 and 416.929, by considering: (1) whether there was an underlying, medically-determinable physical or mental impairment that could be shown by medically acceptable clinical and laboratory diagnostic techniques; and (2) whether these could reasonably be expected to produce Hartung's symptoms. (AR 30.)

The ALJ found that Hartung's medically-determinable impairments could reasonably be expected to cause the alleged symptoms, but that her statements concerning the intensity, persistence, and limiting effects of the symptoms were not credible, at least to the extent inconsistent with his RFC determination. (AR 30.) The ALJ then reviewed Hartung's medical history, noting her recurrence of seizures, diagnostic tests, and episodes of stability. (AR 30.) The ALJ referenced a seizure questionnaire filled out by Hartung's neurologist, Dr. Pupillo, who indicated that: (1) her seizures were not related to alcohol or drug use; (2) she experienced about one seizure a month which lasted about one minute, followed by confusion and exhaustion; and (3) she was capable of low stress jobs. (AR 30). The ALJ also noted Dr. Pupillo's opinion that Hartung would need to be absent from work two days per month because of her seizures. (AR. 30). The ALJ went on to discuss Hartung's history of depression and anxiety, as well as her complaints of cognitive loss. Finally, the ALJ considered the mental residual functional capacity assessment from Hartung's psychiatrist, Dr. Winter, dated April 2010. (AR 33.)

After reviewing Hartung's neurological and mental health history, as reported by her treating physicians, the ALJ determined that Hartung's statements about the frequency of her seizures were not credible to the extent they exceeded the estimates provided by her treating neurologist, Dr. Pupillo.  (AR 33.)  However, the ALJ also did not fully credit Dr. Pupillo's conclusion that Hartung would likely miss two days of work per month due to her seizures.  Without further explanation, the ALJ then found that Hartung has an RFC to perform medium unskilled work, not involving heights or dangerous moving machinery, without having to miss any days due to seizures.  (AR 33.)  As to Dr. Winter's assessment that Hartung would be absent from work more than four days a month due to mood and anxiety disorders, the ALJ appears to have disregarded this estimate on the basis that Dr. Winter attributed some of this absence to Hartung's cannabis abuse and dependence.  (AR 34.)

Ultimately, the ALJ concluded that Hartung retained the RFC for full-time unskilled work with a limitation on working at heights and with machinery.  (AR 34.)  After hearing testimony from the vocational expert premised on this RFC, the ALJ then determined that Hartung was capable of performing her past relevant work as a dishwasher and housekeeper and, thus, was not "disabled" within the meaning of the Social Security Act.  (AR 34.)

OPINION

Hartung contends that the ALJ erred by:  (1) failing to account for his finding that Hartung had moderate limitations in concentration, persistence, and pace in hypothetical

questions presented to the vocational expert; and (2) failing to comply with relevant law in rejecting Dr. Winter's finding as the treating physician that Hartung would be absent from work for more than four days per month. The court agrees.

I. Standard of Review

A federal court reviews an administrative disability determination with deference and will uphold a denial of benefits unless the ALJ's decision is not supported by substantial evidence or is based on an error of law. 42 U.S.C. § 405(g); *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). When reviewing the commissioner's findings under § 405(g), the court cannot reconsider facts, re-weigh the evidence, decide questions of credibility or otherwise substitute its own judgment for that of the administrative law judge. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). Thus, where conflicting evidence allows reasonable minds to reach different conclusions about a claimant's disability, the decision is the Commissioner's. *Edwards v. Sullivan*, 985 F.2d 334, 336 (7th Cir. 1993).

Nevertheless, the court must conduct a "critical review of the evidence" before affirming the Commissioner's decision. *Id.* The decision cannot stand if it lacks evidentiary support or if it "is so poorly articulated as to prevent meaningful review." *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). While the ALJ need not mention every piece of evidence, *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008), he must build

a logical and accurate bridge from the evidence to his conclusion. *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001).

The Social Security Act defines "disability" to mean the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 20C.F.R. § 416.905. To meet this criterion, a claimant must "not only [be] unable to do [her] previous work, but [must be unable], considering [her] age, education, and work experience, [to] engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). Under the five-step sequential evaluation process, "[a]n affirmative answer leads either to the next step or, on [steps three] and [five], to a finding that the claimant is disabled. A negative answer at any point, other than [step three], ends the inquiry and leads to a determination that a claimant is not disabled." *Zurawski*, 245 F.3d at 886 (quoting *Zalewski v. Heckler*, 760F.2d 160, 162 n. 2 (7th Cir. 1985)). The claimant bears the burden of proof in steps one through four. *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995). If the claimant satisfies his burden at step four, then the burden shifts to the Commissioner at step five to prove that the claimant is capable of performing work in the national economy. *See Id.*

**II. Failure to Account for Limitations in Hypothetical Posed to Vocational Expert**

    **A. Limitations in concentration, persistence and pace**

At Step Three, the ALJ expressly found that Hartung had moderate limitations in concentration, persistence and pace, but then failed to account for this limitation in his questioning of the vocational expert. (AR 29.) Instead, the ALJ asked the expert to consider whether Hartung could perform past relevant work if limited to "light, unskilled work." (AR 67.) Hartung correctly argues that the Seventh Circuit does not permit an ALJ to substitute a level of vocational skill for limitations in concentration, persistence, and pace.

Even a cursory review of Seventh Circuit law reveals that "employing terms like 'simple, repetitive tasks' on their own will not necessarily exclude from the vocational expert's consideration those positions that present significant problems of concentration, persistence and pace." *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 620 (7th Cir. 2010). Indeed, the Seventh Circuit has previously and repeatedly rejected the contention that limitations of concentration, persistence, and pace are accounted for limiting the applicant to simple routine tasks. *See Stewart v. Astrue*, 561 F.3d 679, 685 (7th Cir. 2009). The skill level of a job is not necessarily related to the ability of a specific claimant to perform the position, because a claimant's mental condition "may make performance of an unskilled job as difficult as an objectively more demanding job." *Craft*, 539 F.3d at 678 (citations omitted).

The Commissioner nevertheless argues that the ALJ determined that Hartung's moderate concentration, persistence and pace limitations were adequately captured by

13

including a limitation to unskilled work in Hartung's RFC and in the hypothetical question posed to the vocational expert. Where the vocational expert's testimony is focused on hypotheticals, however, the ALJ's questions "must include all limitations supported by medical evidence in the record," and these questions must therefore "account for documented limitations of 'concentration, persistence or pace.'" *Stewart*, 561 F.3d at 684. The ALJ's failure to do this was a reversible error, because it is impossible to say whether the vocational expert would have cleared Hartung to work at her previous jobs with this additional restriction in mind.

### B. Findings of Treating Physicians

Hartung asserts that the ALJ improperly rejected the entire RFC assessment of her primary treating psychiatrist, Dr. Gilda Winter, because Winter had indicated that marijuana use contributed to Hartung's incapacity. Hartung argues that the ALJ failed to follow up with Winter to determine what part of her incapacity was *not* caused by drug use.

When drug and alcohol abuse is a suspected factor in a claimant's condition, an ALJ must determine "whether drug addiction or alcoholism is a contributing factor material to the determination of disability." 20 C.F.R. § 404.1535(b)(2). In other words, the ALJ must determine whether the claimant's physical or mental limitations would still remain if she stopped using drugs or alcohol. *Id.* This involves a preliminary assessment of all of the claimant's impairments, including the drug and alcohol abuse. *Gritzmacher v. Astrue*, 572 F. Supp. 2d 1051, 1059 (W.D. Wis. 2008); *Sage v. Astrue*, No.

14

06-C-0465-C, 2007 U.S. Dist. LEXIS 28056, at *5 (W.D. Wis. Apr. 16, 2007). If the claimant is found to be disabled when the substance abuse is included, the ALJ must then separate out non-substance-abuse impairments and determine whether the claimant would still be disabled without the drug and alcohol abuse. *Id.* "The SSA [has] explained that a finding that drug and alcohol use was material should only be made when the evidence established an individual would not be disabled if he stopped using substances." *O'Connell v. Astrue*, No. 1:06-CV-1113, 2009 U.S. Dist. LEXIS 130867, at *84 (N.D.N.Y Feb. 11, 2009).

Here, the ALJ failed to undertake this two-step assessment. He did not attempt to assess Hartung's disability status by taking into consideration Dr. Winter's statement that Hartung would have to miss "more than four days" a month due to her psychological (and to a lesser extent her cognitive) impairments. Instead, the ALJ simply dismissed the opinion entirely, apparently by assuming that it was entirely the product of Hartung's drug use. As Hartung points out, the ALJ had no way to know what portion of the impairment Dr. Winter ascribed to drug use because he did not ask. Moreover, the ALJ was not qualified to *estimate* himself, because he is not a doctor.

The Commissioner argues that the ALJ was not required to conduct the drug and alcohol abuse analysis pursuant to 20 C.F.R. § 404.1535(b)(2) because the ALJ determined that Hartung was not disabled, even with the effects of her cannabis abuse. Under this logic, the ALJ did not get past the first step in the two-step process described in *Gritzmacher* and *Sage*, and could not have erred in failing to separate the substance abuse from the underlying conditions. If this were indeed why the ALJ did not conduct

the proper analysis, then he did not (at minimum) adequately explain his finding. Moreover, confronted with a medical opinion from the *treating* psychiatrist that would effectively disqualify Hartung from virtually *all* work if credited, the ALJ wholly failed to account for this opinion *aside from* making a cryptic reference to Hartung's drug use.[2]

By any reasonable assessment, the ALJ failed to identify substantial evidence or articulate good reasons to justify a complete dismissal of the opinion of Hartung's long-time treating physician. *See Steele*, 290 F.3d at 940 (a decision cannot stand if lacking in evidentiary support or "is so poorly articulated as to prevent meaningful review"). At minimum, and consistent with the ALJ's duty to develop the record, he should have inquired into the number of many days Hartung would likely miss if she stopped doing drugs. This error is compounded by the ALJ's finding that Hartung's claims of frequent seizures was not credible in the face of her treating neurologist's lower estimate, but rejecting without explanation her neurologist's finding that Hartung would nevertheless likely miss two days of work per month due to seizures. *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001) (ALJ must build a logical and accurate bridge from the evidence to his conclusion); *Huber v. Astrue*, 395 Fed. Appx. 299, 302 (7th Cir.2010) (same). The ALJ's opinion is, therefore, remanded for further consideration.[3]

---

[2] Similarly, the ALJ mentions that Hartung's mood and anxiety disorder had been conservatively treated and states that the record is missing evidence that Hartung has experienced significant problems with social interaction, failing to even address Hartung's uncontradicted testimony at the hearing that she quit her last job when asked to work in an area with other people in it. (AR 45).

[3] Since remand is required anyway, the ALJ should also explain how substantial evidence of regular debilitating seizures from 2007 to 2010 are not enough to satisfy Paragraph C criteria. *See Steele*, 290 F.3d at 940 (ALJ must explain his "analysis of the evidence with enough detail and clarity to permit meaningful appellate review."; *see also Herron v.*

ORDER

IT IS ORDERED that the decision of defendant Carolyn Colvin, Commissioner of Social Security, denying plaintiff Lisa Hartung's application for supplemental security income benefits is REVERSED and REMANDED to the Commissioner pursuant to sentence four of Section 205 of the Social Security Act, 42 U.S.C. § 405(g). The clerk of court is directed to enter judgment accordingly.

Entered this 28th day of March, 2014.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge

*Shalala*, 19 F.3d 329, 333–34 (7th Cir. 1994) (same).